AO 106 (Rev. 06/09) Application for a Search Warrant

**FILED**

**MAR 2 7 2019**

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 6832 Upton Court San Diego, CA 92111 | ) ) ) |

Case No.

# 19MJ1268

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-11 (incorporated by reference).

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. Sections 841(a)(1) and 846. | Possession of Controlled Substances with intent to Distribute and Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
See attached Affidavit of DEA Special Agent Leo Tanlu (incorporated by reference).

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Leovell Tanlu
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **3/26/19**

*Judge's signature*

City and state: San Diego, California

Hon. Bernard G. Skomal, United States Magistrate Judge
*Printed name and title*

## **ATTACHMENT A-11**

1. **Target Location 11** is located at 6832 Upton Court, San Diego, California 92111.  **Target Location 11** is a white with red trim single family home. The numbers "**6832**" are affixed to a post on the front porch, left of the front door, with a security door that faces south towards Upton court. The driveway is to the left of the main door. A white wooden trellis is at the end of the driveway. Red pavers cover the right portion of the driveway with green hedge bushes up against the small porch.  A small cement and metal fence cover the entrance near the sidewalk partway to the driveway.



**ATTACHMENT B**

ITEMS TO BE SEIZED

1. Controlled substances, paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

2. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

3. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

4. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining

1  false identification including birth certificates, drivers license, immigration cards and other
2  forms of identification which the same would use other names and identities other than his
3  or her own.

4

5  5.    All incoming telephone calls received at the residence during the execution of the
6  search warrant and all calls received on cellular telephones found during the execution of
7  the warrant.

8

9  6.    Devices used to conduct counter surveillance against law enforcement, such as radio
10 scanners, police radios, surveillance cameras and monitors and recording devices and
11 cameras.

12

13 7.    Photographs and video and audio recordings which document an association with
14 other coconspirators and/or which display narcotics, firearms, or money and proceeds from
15 narcotics transactions.

16

17 8.    Police radio scanners, pagers, cellular telephones, facsimile machines, telephone
18 answering machines, Caller ID system, and prepaid telephone cards associated with the
19 following individuals:

20       ~~Nalong KEOMANIVONG aka "Elmo,"~~  *as  3/26/19*
21       ~~Minh PHAM~~,  *as  3/26/19*
22       Javier PENALOZA,
23       ~~Nava Jeff PHETHDARA~~  *bo  3/26/19*
24 .

25

26

27

28                                        2

1 The evidence to be seized under the following paragraphs 9 – 13 shall be limited to the

2 period of January 27, 2017 to the present, and must be associated with the

3 individual listed above. *AF* 3/26/19

4 9.    Travel documents including itineraries, airline tickets, boarding passes, motel and

5 hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and

6 receiving documents relating to the delivery of packages.

7

8 10.    Banking and financial institution records, bank statements, credit card statements,

9 canceled checks, money orders, deposit slips, orders for or receipt of money transfer by

10 wire, checking and saving books, financial institution statements, safe deposit boxes, loan

11 statements, tax returns, business and personal ledgers, and accounting records.

12

13 11.    Records relating to the lease of storage lockers, telephone/address directories and

14 other papers containing telephone numbers and addresses.

15

16 12.    Records related to the purchase of real estate, vehicles, precious metals, jewelry and

17 other tangible assets.

18

19 13.    Authorization to search the cellular telephone includes the search of disks, memory

20 cards, deleted data, remnant data, slack space, and temporary or permanent files contained

21 on or in the cellular telephone.  The seizure and search of the cellular telephone will be

22 conducted in accordance with the affidavit submitted in support of the warrant. With

23 respect to any and all electronically stored information in cellular phones and PDAs, agents

24 may access, record, and seize the following:

25         a.    telephone numbers of incoming/outgoing calls stored in the call registry;

26         b.    Digital, cellular, and/or telephone numbers and/or direct connect numbers,

27 names and identities stored in the directories;

28
                                                3

1        c.      Any incoming/outgoing text messages relating to violations of 21 U.S.C. §§

2  841(a)(1) and 846;

3        d.      telephone subscriber information;

4        e.      the telephone numbers stored in the cellular telephone and/or PDA; and

5        f.      any other electronic information in the stored memory and/or accessed by the

6  active electronic features of the digital or cellular phone including but not limited to

7  photographs, videos, e mail, and voice mail relating to violations of 21 U.S.C. §§ 841(a)(1)

8  and 846.

4

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Leonell Tanlu, being duly sworn under oath, declare and state:

## EXPERIENCE AND TRAINING

1.     I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. §§ 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.     I am a Special Agent (SA) with DEA and have been so employed since 2004. I am currently assigned to the DEA San Diego Division Office. I have received formal training and have experience in narcotics and gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. I have monitored numerous calls and meetings with persons under investigation, including wiretap communications of drug traffickers and gang members and associates. I have worked alongside and consulted with many law enforcement officials and other professionals experienced in drug and gang investigations. Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members discuss criminal matters over the telephone and often use coded or vague language. I am aware of how drug traffickers and gang members organize and operate their illegal activities, including the use of locations, vehicles, and other resources in the furtherance of the illegal activities. I am familiar with the typical make up and operation of gangs and drug trafficking organizations including the distribution, storage, and transportation of the drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

3.     The following is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, interviews, database and public records checks, searches, telephone toll analysis, and other investigation. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested warrant. Conversations and discussions below are set forth in substance unless noted.

## REQUESTED SEARCH WARRANTS

4.     I submit that the facts contained herein demonstrate probable cause to believe that the fruits, instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances); Title 21, United States Code, Sections 841(a)(1) (Possession of Controlled Substances with intent to Distribute); Title 21, United States Code, § 843(b) (Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance); and Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(h) (Conspiracy to Launder Monetary Instruments); more fully described in ATTACHMENT B; will be found at the residence (including the structure, all attached and unattached structures, rooms, attics, basements, garages, and parking spaces (including vehicles and trailers parked therein) assigned to or part of the location; storage areas, safes, briefcases, containers, trash areas within the location to be searched, surrounding grounds and outbuildings assigned to or part of the location) at the **Target Locations**:

a.     **Target Location 1**:  1988 Hazelwood Place, San Diego, CA 92105;

b.     **Target Location 2**:  (DROPPED FROM WARRANT APPLICATION)

c.     **Target Location 3**:  "City Pub" – 4977 El Cajon Boulevard, San Diego, CA 92115;

d.     **Target Location 4**:  4977 ½ El Cajon Boulevard, San Diego, CA 92115;

e.     **Target Location 5**:  6533 Lemerand Avenue, San Diego, CA 92115;

f.     **Target Location 6**:  6540 Lemerand Avenue, San Diego, CA 92115;

2

g.     **Target Location 7**:  154 Daisy Avenue, Apt. #C, Imperial Beach, CA 91932;

h.     **Target Location 8**:  4697 51st Street, Apt. #2, San Diego, CA 92115;

i.      **Target Location 9**:  4091 Winona Avenue, San Diego, CA 92105;

j.      **Target Location 10**:  4321 Altadena Avenue, San Diego, CA 92115;

k.     **Target Location 11**:  6832 Upton Court, San Diego, CA 92111;

l.      **Target Location 12**:  701 W. Beech Street, Apt. #2203 San Diego, CA 92101;

m.    **Target Location 13**:  4747 Crooked Creek, San Diego, CA 92113.

This affidavit is submitted in support of search warrant applications for **Target Location 10**, **Target Location 11**, **Target Location 12**, and **Target Location 13**, which are more fully described at Attachments A-10 thru A-13 (hereinafter collectively referred to as "**Target Locations**"). Because of the overlapping nature of the criminal activity, Crooked Angels **Target Locations 1 - 9** are also referenced in this affidavit. This affidavit incorporates by reference the Affidavits submitted in support of the applications for **Target Locations 1 – 9**.

### **FACTS ESTABLISHING PROBABLE CAUSE**

#### **A.     Investigation Background**

5.     The "Crooked Angels" investigation targeted gang members and affiliates who are involved in the distribution of controlled substances in San Diego and out of state.  The gangs involved include: Oriental Crips; Tiny Rascal Gang; Oriental Killer Boys; Viet Boys; and Linda Vista 13.  The investigation Target Subjects, however, ignored gang affiliation while distributing drugs and readily distributed drugs to individuals affiliated with rival gangs. The Target Subjects engaged in drug distribution at their residences in the City Heights, College Grove and Imperial Beach communities in San Diego.

6.     During the investigation, law enforcement learned that several of the Target Subjects were involved in the distribution of prescription opioids.  Additionally,

3

investigators determined that several of the Target Subjects were involved in the distribution of counterfeit prescription opioids laced with Carfentanil. Investigators determined that one individual died as a result of ingesting the Carfentanil and another individual was seriously injured.

7. Additionally, several of the Target Subjects distributed marijuana to locations along the eastern seaboard using United Parcel Service (UPS) and the United States Postal Service. Investigators identified Manoxay INSISIENMAY as the principle marijuana distributor who obtained marijuana from marijuana grow operations in the Central District of California and then distributed it locally or shipped it out of state. INSISIENMAY operated from a local drinking establishment "City Pub" on El Cajon Boulevard. Investigators learned that the Target Subjects processed and packaged marijuana at the apartment attached to the rear of the "City Pub." Investigators seized numerous parcels containing marijuana destined for Maryland where other individuals distributed the marijuana. Investigators also seized parcels containing drug proceeds mailed from out of state locations to San Diego. During the investigation, investigators identified several individuals operating funnel accounts[1] on behalf of INSISIENMAY. Drug distributors on the east coast made cash deposits into the funnel accounts then the Target Subjects withdrew the cash in San Diego. Investigators identified in excess of $100,000 in cash transactions through the funnel accounts. Investigators executed three marijuana-grow search warrants in the Central District of California and seized over 7000 marijuana plants. In addition, investigators executed a search warrant at an Air BnB and seized over $50,000 from out of state marijuana buyers who traveled from Florida to San Diego to buy marijuana.

//

//

---

[1] A "funnel account" is a financial account used by drug traffickers to accept cash deposits of drug sale proceeds in one location that is later withdrawn from a different location.

**B.   Indictment**

8.   On March 14, 2019, a federal grand jury in the Southern District of California, returned three sealed indictments.  The three indictments charged twenty defendants.  The indictments allege violations of: Title 21, United States Code, Sections 841(a)(1) and 846, Conspiracy to Distribute Controlled Substances; Title 21 United States Code, Section 841(a)(1), Possession of Cocaine/Methamphetamine With Intent to Distribute; Title 21, United States Code, Section 841, Distribution of Carfentanil Resulting in Death; and Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(h), Conspiracy to Launder Monetary Instruments.  The indicted individuals include:

> Dat Pham Tien Tran aka "Damian,"
> Darren Pham Tran aka "Denny,"
> Anthony Vibounphonh aka "Ant,"
> Armando Angeles,
> Kristine Tuyetvan TRUONG aka "K,"
> Nalong KEOMANIVONG aka "Elmo,"
> Minh PHAM,
> Javier PENALOZA,
> Jimmy SENGPASEUTH,
> Nava Jeff PHETHDARA,
> Eric ANGELES
> Manoxay INSISIENMAY aka "Mano"
> Manosang INSISIENMAY aka "Dustin"
> Amphone VINSON
> Daorine DETHAMPHAIVAN aka "Tik"
> Egzon HAXHIJA aka "X" aka "Florida"
> Troy COOLEY
> Linda INSISIENMAY
> Malive PARKER
> Heather ODOM

**C.   Wiretaps**

9.   On May 13, 2017, United States District Judge Janis L. Sammartino, Southern District of California, issued an Order authorizing the interception of communications to and from a telephone used by Anthony VIBOUNPHONH aka "Ant" (hereinafter "TT1"), and a telephone used by Nalong KEOMANIVONG aka "Elmo" hereinafter "TT2").

5

10. On August 31, 2017, Judge Sammartino, authorized renewed interception of TT1 and initial interception of a telephone used by Minh Huu PHAM (hereinafter "TT3").

11. On March 1, 2018, Judge Sammartino, authorized the initial interception of communications to and from telephones used by: Manoxay INSISIENMAY aka "Mano" (hereinafter "TT4"); Nava Jeff PHETHDARA (hereinafter "TT5"); Armando ANGELES aka "Mando" (hereinafter "TT6"); Javier PENALOZA (hereinafter "TT7"), and Kristine TRUONG (hereinafter "TT8").

12. On April 27, 2018, Judge Janis L. Sammartino, authorized the renewed interception of TT4, TT6, TT7, and the initial interception of a telephone used by Dat TRAN aka "Damien" (hereinafter "TT9"); a second telephone used by Manoxay INSISIENMAY aka "Mano" (hereinafter "TT10"), and a second telephone used by Javier Hernandez PENALOZA (hereinafter "TT11").

## TARGET LOCATIONS 10, 11, 12, and 13

13. During the investigation, investigators conducted a series of "controlled buys" from the Target Subjects. During the controlled buys, investigators learned that Minh PHAM, Javier PENALOZA, Anthony VIBOUNPHONH, and Nalong KEOMANIVONG, operated in concert to distribute cocaine and marijuana. For example, during the lead-up to a controlled buy on January 27, 2017, KEOMANIVONG negotiated the sale of controlled substances, including cocaine, with an undercover investigator (hereinafter "UC"). However, during the actual controlled buy, KEOMANIVONG brought PHAM and PENALOZA to the meet and introduced them to the UC. PHAM instructed the UC to contact him for future cocaine sales. Later, during the wiretap interceptions, investigators conducted several controlled buys and identified Jimmy SENGPASEUTH, and Nava Jeff PHETHDARA as cocaine sources of supply for PHAM.

14. Minh PHAM lives at **Target Location 10**. Investigators are aware that PHAM has claimed **Target Location 10** as his primary residence before and during the

wiretap intercepts.   During surveillance and enforcement operations, investigators learned that PHAM resided at 4022 Highland Avenue, San Diego.  PHAM currently resides at **Target Location 10**.  Investigators have observed PHAM at **Target Location 10** as recently as March 1, 2019.  Further, investigators observed PHAM's vehicle in the **Target Location 10** driveway on March 8, 2019, and parked curbside on March 9, 2019.

15.    Javier PENALOZA lives at **Target Location 11**.   Investigators have observed PENALOZA's vehicle at **Target Location 11** as recently as March 13, 2019. Further, during a ruse call, PENALOZA told investigators that he lives at **Target Location 11**.

16.    Jimmy SENGPASEUTH lives at **Target Location 12**.  During January of 2019, SENGPASEUTH submitted a change of address alert to the U.S. Postal Service listing his residence as **Target Location 12**.  On March 8, 2019, U.S. Postal Inspectors intercepted a package mailed from Amsterdam, Netherlands, addressed to SENGPASEUTH at **Target Location 12**.  A narcotic detection dog alerted to the parcel and investigators obtained and executed a search warrant which revealed that the parcel contained two pairs of running shoes.  On March 17, 2019, investigators knocked on the door at **Target Location 12** and observed SENGPASEUTH open the door.

17.    Nava PHETHDARA lives at **Target Location 13**.  On March 8, 9, 10, 15, and 16, 2019, investigators observed PHETHDARA's white Lexus bearing CA license plate 7UAR726 parked inside the gate of **Target Location 13**. On March 18, 2019, investigators observed PHETHDARA driving a white Honda arrive at **Target Location 13** and enter the gated driveway of **Target Location 13**.

### *January 27, 2017 – 112-gram Controlled Cocaine Buy from KEOMANIVONG, PHAM and PENALOZA*

18.    On January 27, 2017, investigators made a four-ounce cocaine controlled buy with UC.  Prior to the operation, UC was in contact with KEOMANIVONG via

1  recorded telephone calls and text messages.  KEOMANIVONG agreed on a purchase
2  price of $4800.00 for a quarter-pound (four-ounces) of cocaine.

3      19.    Investigators initiated surveillance and followed KEOMANIVONG to the
4  Café 102 parking lot in San Diego.  KEOMANIVONG then departed from Café 102
5  and traveled to the Café Zen parking lot at 5182 El Cajon Boulevard.  UC met
6  KEOMANIVONG shortly thereafter.  KEOMANIVONG introduced the UC to Minh
7  PHAM and Javier PENALOZA.  PENALOZA handed PHAM a latex glove containing
8  four individual wrapped one-ounce packages of cocaine.  PHAM removed the cocaine
9  packages from the glove then gave them to the UC.  PHAM provided his telephone
10  number to UC and told UC to contact him directly for future drug sales.  UC paid PHAM
11  $4300 for the cocaine and paid KEOMANIVONG $500 for brokering the deal.  PHAM
12  and PENALOZA departed the area in a black Honda Accord bearing California license
13  plate 7EGH092 (registered to Javier and Daniel Penaloza 6832 Upton Court, San Diego,
14  California, **Target Location 11**).  The DEA Lab determined that the substance was 112
15  grams of cocaine.

16  ### *May 11, 2017 – 112-gram Controlled Cocaine Buy from PHAM/SENGPASEUTH*

17      20.    On May 9, 2017, investigators initiated text messaging with PHAM in
18  order to set up a cocaine buy walk.  Ultimately, investigators negotiated a quarter-pound
19  cocaine purchase from PHAM for $4000.00.  PHAM agreed to meet with a CS[2] on May
20  11, 2017, to conduct the cocaine deal.

21
22

23  [2] All communications during this controlled buy were audio recorded and observed by investigators conducting surveillance.  CS has been cooperating with the DEA since 2013 with periods in which CS was
24  deactivated as a confidential source.  CS began cooperating for after being arrested in connection with the transportation of seven tons of marijuana from Mexico to Los Angeles for which CS was not charged due to
25  his/her cooperation.  CS has continued to cooperate with the DEA in exchange for monetary payment and has been paid approximately $20,000 to date.  CS has been deemed reliable and his/her cooperation has led to
26  several arrests and seizures of drugs.  CS's criminal history includes 2017 DUI misdemeanor conviction, 2015
27  grand theft auto conviction with 365 days in custody (CS was deactivated as confidential source by the DEA prior to this arrest and conviction), 2007 driving with suspended license with 10 days in custody, and CS was
28  arrested in December 2012 for sale/furnish marijuana.

21.     On May 11, 2017, investigators employed the standard protocols for a buy-walk, then equipped a cooperating source (hereinafter "CS") with a transmitter/recorder to audio record the buy walk.  Investigators established surveillance at 4022 Highland Avenue, San Diego (PHAM's residence at the time).  Investigators observed CS arrive at 4022 Highland Avenue.  PHAM met with the CS and told CS he was waiting on the source of the cocaine to arrive.  A short time later, PHAM's source of supply arrived at 4022 Highland Avenue in a red Subaru, registered to Jimmy SENGPASEUTH. Investigators observed the driver of the Subaru and identified him as SENGPASEUTH. PHAM entered the red Subaru.  A few minutes later, investigators saw PHAM exit the Subaru and return to the CS' vehicle.   PHAM provided CS a clear ziplock bag containing cocaine.  CS paid PHAM $4000.00 for the four ounces of cocaine.    PHAM exited CS' vehicle and re-entered SENGPASEUTH's vehicle.  CS departed the area followed by investigators.  SENGPASEUTH and PHAM drove around the block and returned to the residence. PHAM exited SENGPASEUTH's vehicle and stood in front of the residence and a few minutes later walked towards the residence.  Investigators also followed SENGPASEUTH to a residence located on Wheelhouse Drive in San Diego.

22.     Investigators   followed   CS   to   a   pre-arranged   meeting   location. Investigators   retrieved   the   zip-lock   bag   containing   the   cocaine   and   the transmitter/recorder.  Investigators searched the CS and CS' vehicle.  Investigators found no contraband.  The DEA Lab determined that the substance was 112.5 grams of cocaine.

### *September 18, 2017 – PHAM Orders Quarter-Pound of Cocaine from PHETHDARA*

23.     On September 18, 2017, at approximately 7:18 p.m., PHAM (TT3) sent an outgoing text message to PHETHDARA (TT5).  The text message read, "How's the qp looking?"

24.     On September 18, 2017, at approximately 8:45 p.m., PHAM (TT3) called PHETHDARA (TT5). PHAM asked, "How much is an O (ounce of cocaine)?" PHETHDARA replied, "I don't have any right now, except for powder." PHAM asked, "How much will you take for an O (ounce of cocaine) right now?" PHETHDARA responded, "I usually sell it for ten-fifty ($1050.00 for an ounce of cocaine) to other people, but will give it to you for nine-fifty ($950.00 for an ounce of cocaine)." PHAM stated, "I can't make any money off that." PHETHDARA stated, "I'll get it (cocaine) in a day or two." PHAM stated, "I'll wait for the QP (quarter pound of cocaine)."

### *September 19, 2017 – PHETHDARA Sells One Ounce of Cocaine to PHAM*

25.     On September 19, 2017, at approximately at 7:00 p.m., PHETHDARA (TT5) called PHAM (TT3). PHETHDARA stated, "I got that (ounce of cocaine) for you. Do you want to do it?" PHAM replied, "Yes. Come to Highland (PHAM's residence at the time)." Investigators established surveillance at 4022 Highland Avenue, San Diego, and observed a white Mercedes arrive. At approximately 7:17 p.m., PHETHDARA (TT5) called PHAM (TT3) and stated, "I'm here." PHAM replied, "I'll come outside." Investigators observed PHAM exit the residence and enter the Mercedes. The Mercedes departed, drove around the block, and stopped at the residence. PHAM exited the vehicle and entered the residence.

### *September 26, 2017 – PHAM and PHETHDARA Discuss Half-Pound of Cocaine.*

26.     On September 26, 2017, at approximately 3:58 p.m., PHAM (TT3) placed an outgoing to PHETHDARA (TT5). PHAM asked, "How much for a half pound (1/2 pound of cocaine)?" PHETHDARA replied, "I usually charge seventy-two ($7200.00 for ½ pound of cocaine)." PHAM asked, "When will you have the half (1/2 pound of cocaine)?" PHETHDARA responded, "By next weekend."

//

//

//

### *September 27, 2017 – UC Controlled Purchase of 4 Ounces of cocaine from PHAM/PHETHDARA*

27.     On September 26, 2017, investigators directed CS to contact PHAM to set up a cocaine buy.  At approximately 3:53 p.m., PHAM (TT3) texted CS, "I can't do lower than 950, I have to split three-way.  This shit move fast...It'll be 3800$ for a qp." At approximately 3:54 p.m., CS called PHAM (TT3) and requested a half-pound of cocaine.

28.     At approximately 3:59 p.m., PHAM (TT3) contacted PHETHDARA and asked PHETHDARA the price of a half-pound of cocaine.  PHETHDARA stated he did not have that much on him but normally sold a half-pound for $7200.  PHAM asked PHETHDARA to text him an actual price.

29.     At approximately 4:00 p.m., PHAM (TT3) contacted CS and said that his source of supply (PHETHDARA) was dry.  PHAM asked if CS still wanted the quarter-pound of cocaine.  CS replied, "Yes."

30.     At approximately 4:06 p.m., PHAM (TT3) texted PHETHDARA, "I have someone coming down t grab a qp tomorrow, my batch been broken down already.  You have another qp to spare?  I'm flipping that around 4-5 tomorrow."  PHETHADARA texted, "Is it for sure?"   PHAM (TT3) texted, "Yea dude always come thru." PHETHDARA texted, "Ok I'll put that aside for you."

31.     At approximately 4:31 p.m., PHAM (TT3) texted CS, "It's for sure tomorrow right?  I'm getting the qp ready today."  CS texted, "Yes.  It is."

On September 27, 2017, at approximately 2:08 p.m., PHETHDARA texted PHAM (TT3), "Still gonna need that today?"  PHAM texted, "Yes sir."

32.     At approximately 4:12 p.m., CS contacted PHAM (TT3) and advised PHAM of the person (UC) who was going to pick up the cocaine.  PHETHDARA then texted PHAM, "When do you want do this?"  PHAM texted, "Soon before 5…I just got off the phone with dude."

33.   At approximately 5:12 p.m., UC2 called PHAM and advised that the UC would be there in 20 minutes.  PHAM texted the UC the address "4180 44th Street 92105 San Diego."

34.   At approximately 5:20 p.m., PHAM texted PHETHDARA, "I'm ready the gonna be here in 15 min meet me at 4180 44th St."  PHETHDARA texted, "Front or alley?"  PHAM texted, "Alley."

35.   At 6:04 p.m., investigators observed the UC vehicle arrive at Spotts Liquor Store parking lot.  UC placed a call to PHAM instructing PHAM that he was in the liquor store parking lot.  PHAM told UC he would meet in the parking lot.

36.   At approximately 6:06 p.m., PHAM arrived in the parking lot and entered the front passenger side of the UC vehicle.  PHAM placed the bag containing the cocaine in the center console.  UC provided PHAM with $3800.  PHAM departed the UC vehicle and walked towards the alley and entered the alley driveway of 4180 44th Street, San Diego.  Investigators observed PHETHDARA in a white Mercedes pull out of the alley driveway of 4180 44th Street shortly thereafter and followed him back to **Target Location 13**.  The DEA Lab determined that the substance was 111.5 grams of cocaine.

### *October 5, 2017 - PHAM Confirms His Residence as Target Location 10*

37.   On October 5, 2017, at approximately 9:09 a.m., PHAM (TT3) called the San Diego County Credit Union to report his card lost.  During the call, PHAM verified his mailing address as 4321 Altadena Avenue, San Diego (**Target Location 10**).  The next day, PHAM (TT3) called an individual he identified as "Mom."  Mom told PHAM she needed the house key and asked PHAM where he was.  PHAM replied that he was on his way. (Because PHAM has used **Target Location 10** as his residence on multiple occasions, investigators believe that some of PHAM's family members also live at **Target Location 10**.)

38.   On October 6, 2017, multiple drug customers contacted PHAM for drugs. For example, at approximately 8:58 p.m., Austin Jones called PHAM (TT3).  Austin

told PHAM that he needed 1g and a half (1.5 grams of controlled substances) and asked how much.  PHAM replied that he would charge Jones $30 for the "half" and $60 for the "g" so the total would be $90. Jones sent a text message to PHAM soon after stating: "Can you bring me a g and a half g."  In a subsequent call from PHAM (TT3) to Jones, PHAM said he was "here."

### June 22, 2018 – Undercover Investigators Text PHAM

39.    On June 22, 2018, investigators acting in an undercover capacity contacted PHAM by text message in order to set up cocaine controlled buys.   Although investigators did not ultimately make a controlled buy, PHAM confirmed that he would still sell cocaine to the undercover investigator.

### March 17, 2018 – Drug Customers Order Drugs from PHETHDARA

40.    On March 17, 2018, at approximately 10:19 a.m., an unknown male (hereinafter UM7514) sent a text to PHETHDARA (TT5) stating, "What's sup brotha, can I place an order for 7 Tesla's?"  In response, PHETHDARA sent a text to UM7514 stating, "yeah."   Investigators believe that "Tesla" is a reference to controlled substances.   At approximately 1:07 p.m., PHETHDARA (TT5) sent a different unknown male (hereinafter "UM0744") a text message that stated, "Orange tesla." UM0744 responded, "Can I pick up? Music Festival tonight." Investigators believe that UM0744 was ordering controlled substances from PHETHDARA.  Thereafter, PHETHDARA  and  UM0744  made  arrangements  to  meet  at  the  "Bullpen." Investigators established surveillance at the Bullpen Sports Pub on Clairemont Mesa Boulevard and observed PHETHDARA meet with an unknown male.  Investigators believe that PHETHDARA distributed controlled substances, most likely containing ecstasy.

### March 23, 2018 – UC Controlled Buy 3.5 Grams of Cocaine from PHETHDARA

41.    An undercover investigator (hereinafter "UC4") initiated a text message exchange with PHETHDARA in order to set up a controlled buy of 3.5 grams of cocaine from PHETHDARA.   Ultimately, PHETHDARA and UC4 arranged for the buy on

13

March 23, 2018.  The purpose of this initial buy was to set up larger transactions later. Ultimately, however, investigators were unable to set up more buys.

42.     On March 23, 2018, at approximately 11:00 a.m., investigators established surveillance at PHETHDARA's residence at **Target Location 13**.

43.     At approximately 11:17 a.m., UC4 called PHETHDARA (TT5).  UC4 ordered an eight ball (3.5 grams) of cocaine for $180.  UC4 instructed PHETHDARA to meet at the Fashion Valley mall parking lot.  PHETHDARA agreed to meet there. At approximately 11:35 a.m., PHETHDARA (TT5) called UC4.  PHETHDARA indicated he was about to leave his place and would be driving a white Lexus.

44.     At approximately 11:40 a.m., investigators observed PHETHDARA in a white Lexus bearing California license plate 7UAR726 (registered to Nava Jeff PHETHDARA).  Investigators followed PHETHDARA to the Fashion Valley Mall parking lot where he parked next to UC4's vehicle.

45.     At approximately 11:55 a.m., PHETHDARA exited the white Lexus and entered the front passenger side of UC4's vehicle. PHETHDARA placed a clear plastic bag containing the suspected cocaine in the center console area of UC4's vehicle.  UC4 gave PHETHDARA $180 for the eight ball of cocaine.  PHETHDARA exited UC4's vehicle and departed the area.  Investigators followed him back to **Target Location 13**. The DEA Lab determined that the substance was 3.48 grams of cocaine.

### *March 30, 2018 – PENALOZA Sells Cocaine*

46.     On March 30, 2018, at approximately 4:11 p.m., an unknown male aka "Jose" called PENALOZA (TT7).  Jose said, "I sent Smokey's (Oscar Luna) number and he can get the stuff (2 ounces of cocaine) for you…That's my only connect (source of supply of cocaine) right now.  Give him a call."  Based upon this intercepted call and text message, investigators believe "Jose" provided Luna's number to PENALOZA so that PENALOZA could obtain the two ounces of cocaine from Luna.

47.     On March 30, 2018, at approximately 4:12 p.m., PENALOZA (TT7) called Oscar Luna.  PENALOZA said, "It's Fatboy.  Got your number from Jose…Can I get

14

two onions (2 ounces of cocaine)?"  Luna replied, "Yes."  PENALOZA asked, "How much is it going for?"  Luna replied, "Nine for each ($900 per ounce of cocaine)." PENALOZA agreed to meet with Luna.  Based upon the intercepted telephone call investigators believe PENALOZA purchased two ounces of cocaine from Luna for $900 per ounce.

48.    On March 30, 2018, at approximately 11:21 p.m., an unknown male called PENALOZA (TT7).  The unknown male asked, "You have anything?"  PENALOZA replied, "How much you need…A seven (7 grams of cocaine or a quarter ounce)…I'm in Linda Vista by the Arco."  The unknown male replied, "Send me the address."  On March 30, 2018, at approximately 11:25 p.m., PENALOZA (TT7) called the unknown male. PENALOZA said, "I sent it…Did you get it?"  The unknown male replied, "Yes." PENALOZA responded, "Three hundred a quarter ($300 for 7 grams of cocaine)."  The unknown male replied, "You have a half (half ounce of cocaine)?"  PENALOZA said, "Yeah.  Five hundred ($500 for a half ounce of cocaine)."  The unknown male replied, "On my way."   Based upon the intercepted conversations and text message, investigators believe PENALOZA distributed as much as one-half ounce of cocaine to the unknown male for $500.

### *May 26, 2018 – PENALOZA and UM Discuss Drug Sales*

49.    On May 26, 2018, at approximately 2:51 p.m., investigators intercepted a call made by PENALOZA (TT11) to an unknown male (hereinafter UM8384).  During their conversation, PENALOZA asked UM8384 what he thought about the "pen" (vape pen).  UM8384 replied "that shat was dank" (the vape pen contained high grade THC extract).  Later during the same conversation, UM8384 told PENALOZA to bring him "Gelato" (marijuana strain).  PENALOZA replied that he was sold out of every single one.

### *March 14, 2019 –Marijuana Delivered to Target Location 11*

50.    On March 14. 2019, at approximately 9:30 a.m., while conducting surveillance at **Target Location 11**, investigators observed a white Toyota Tacoma pull

into the driveway at **Target Location 11**.  An unidentified male exited the Toyota Tacoma carrying what appeared, based on investigators' training and experience, to be two clear bags containing marijuana, specifically, trimmed marijuana buds.  The bags appeared to contain multiple pounds of marijuana.  At approximately 9:44 a.m., investigators observed a black Honda sedan registered to PENALOZA in driveway of **Target Location 11**.  The Honda was already parked in the driveway when the Toyota Tacoma arrived, but was not immediately visible because the view of the driveway was obscured by a gate.

## **BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT**

46.     Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

a.     Individuals involved in drug trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

b.     Individuals involved in drug trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time.  It is common, for example, for drug traffickers to keep pay/owe sheets or other papers of drug sold and monies owed.  Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts.  Such records are often maintained for a substantial period of time even after the debts are collected.  I have found in my training and experience that such records are invaluable to drug traffickers and that such records are rarely discarded.  Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators.

c.     Individuals involved in drug trafficking must often rely on others to obtain their drugs and to help them market the drugs.  Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence.

d.      Individuals involved in drug trafficking commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace.  Records of these and other types of transactions are often found at the residences of individuals involved in drug trafficking.

e.      Individuals involved in drug trafficking often keep and maintain large amounts of United States currency at their residences.  Such funds are often used for everyday expenditures and to maintain and finance their ongoing drug business.  Additionally, individuals involved in drug trafficking often amass and maintain assets at their residence which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

f.      Individuals involved in drug trafficking often maintain weapons, firearms and ammunition on their person or in their residence and/or vehicles.  Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms.  Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their drug and firearms dealings.

g.      Residences and premises used by individuals involved in drug trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

h.      Drug traffickers commonly use cellphones, blackberries, PDAs, other personal handheld electronic devices, and laptop and desktop computers to

17

communicate with, among others, their customers, their suppliers, and other criminal associates and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities.  Drug traffickers also commonly store records of the business of distributing and selling drugs, on computers and computer discs, diskettes, cassettes, tapes, and other forms of digital media.  Drug traffickers commonly maintain these items on their person and/or in their residences and vehicles.

i.    Individuals involved in drug trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

j.    Individuals involved in drug trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with drug proceeds or property utilized to facilitate drug trafficking activities.  Such items are typically maintained in their residences.  Drug traffickers often store information relating to their drug trafficking business on their cellular telephones, PDAs, computers and/or computer disks.

## CELL PHONE SEARCH WARRANT METHODOLOGY PARAGRAPH AND ATTACHMENTS

### Procedures For Electronically Stored Information.

47.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy

18

all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

48.    Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis.  All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

49.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.   The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court

## PRIOR ATTEMPTS TO OBTAIN DATA

50.    The United States has not attempted to obtain this data by other means.

## CONCLUSION

51.    Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all the facts and opinions set forth in this affidavit, I believe that the items set forth in ATTACHMENT B (incorporated herein by reference), which evidence violations of

1  Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute
2  Controlled Substances); Title 21, United States Code, Sections 841(a)(1) (Possession
3  of Controlled Substances with intent to Distribute); as set forth above, will be found at
4  the **Target Location**s more fully described in ATTACHMENTs A-10 through A-13.

5      52.    Because this is an ongoing investigation and premature disclosure of the
6  investigation could endanger agents and officers, cause the target subjects and others to
7  flee, and cause destruction of evidence, I request that this affidavit, the application for
8  the search warrant, the search warrant, and all other associated court records be sealed
9  until further court order.

Leo Tanlu, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me
this ___26___ day of March 2019.

Honorable Bernard G. Skomal
United States Magistrate Judge

20